Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Joanna B. Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company, and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY, and GEICO
CASUALTY COMPANY,                                          Docket No.: _____(     )

                              Plaintiffs,

            -against-                                      **Plaintiffs Demand a Trial**
                                                          **by Jury**

APEX MEDICAL, P.C.,
ARKAM REHMAN, M.D.,
JOHN DOE DEFENDANTS "1" – "10"

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $239,000.00 that the Defendants wrongfully

obtained from GEICO, and further seeks to extinguish more than $1,543,000.00 in pending

1

fraudulent billing, resulting from Defendants' submission of thousands of fraudulent no-fault insurance charges relating to medically unnecessary, experimental, and otherwise non-reimbursable healthcare services, including NervoMatrix Localized Intense Neurostimulation Therapy/Trigger Point Impedance Imaging ("Nervomatrix LINT/TPII Treatment"), Extracorporeal Shockwave Therapy ("ESWT"), and pain management injections (collectively, the "Fraudulent Services") allegedly provided to New York automobile accident victims covered by policies of insurance issued by GEICO ("Insureds").

2.    Defendant Arkam Rehman, M.D. ("Dr. Rehman") is a physician residing and primarily practicing in Florida, who purports to own a New York professional corporation, Apex Medical, P.C. ("Apex Medical") that has billed GEICO for the Fraudulent Services.  Dr. Rehman, colluding with John Doe Defendants "1" to "10" who are located in New York, engaged in a scheme to exploit New York's No-Fault insurance system by using Apex Medical to render, or purport to render, a mix of medically unnecessary, excessive, and experimental services at various multidisciplinary medical clinics that almost exclusively treat "No-Fault" insurance patients (the "No-fault Clinics").

3.    Defendants rendered, or purported to render, the Fraudulent Services at the different No-fault clinics indiscriminately, without any regard for genuine patient care, and solely based on their ability to exploit the patients for financial gain.  As part of the scheme, Defendants engaged in illegal referral and kickback arrangements to access a steady stream of patients for Apex Medical, so they could then fraudulently bill GEICO and other New York automobile insurers.

4.    In addition to recovering the monies stolen from it, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,543,000.00 million in pending no-fault insurance claims that have been submitted by or on behalf of Apex Medical because:

> (i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;
>
> (ii)     Dr. Rehman, Apex Medical and the other Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, Apex Medical was ineligible to bill for or to collect No-Fault Benefits; and
>
> (iii)     the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

5.     The Defendants fall into the following categories:

> (i)     Apex Medical is a medical professional corporation through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.
>
> (ii)     Arkam Rehman, M.D. ("Dr. Rehman") is a physician residing in Florida but licensed to practice medicine in New York and who purports to own and control Apex Medical and who purported to perform some of the Fraudulent Services.
>
> (iii)     John Doe Defendants "1" – "10" (the "Management Defendants") are persons and entities, presently not identifiable, who participated in and furthered the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of Apex Medical and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Apex Medical, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.     As discussed below, Apex Medical, Dr. Rehman, and the Management Defendants (collectively, the "Defendants") at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) Dr. Rehman, Apex Medical and the Management Defendants engaged in illegal fee-

splitting, kickback, and referral arrangements and, therefore, Apex Medical was ineligible to bill for or to collect No-Fault Benefits; and (iii) the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

7.     As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services billed to GEICO through Apex Medical.

8.     The chart annexed hereto as Exhibit "1" sets forth the fraudulent claims GEICO has identified to-date that Defendants have submitted, or caused to be submitted, to GEICO.

9.     Defendants' fraudulent scheme perpetrated against GEICO and other New York automobile insurers began as early as 2019 and continues uninterrupted through present day. As a result of the Defendants' scheme, GEICO has incurred damages of more than $239,000.00.

## THE PARTIES

**I.     Plaintiffs**

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in New York and New Jersey.

**II.     Defendants**

11.     Defendant Dr. Rehman resides in and is a citizen of Florida. Dr. Rehman was licensed to practice medicine in New York on April 12, 2019, and purports to own Defendant Apex Medical.

12.     Defendant Apex Medical is a New York medical professional corporation, incorporated on or about July 25, 2019, with its principal place of business at 51 Atlantic Avenue, Floral Park, New York.

13.     John Doe Defendants "1" though "10" (the "Management Defendants") are additional individuals and entities whose names are not yet known to GEICO.  The Management Defendants at all times have participated in and furthered the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of Apex Medical and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Apex Medical, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

15.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

16.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

17.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

18.     GEICO underwrites automobile insurance in New York.

**I.      An Overview of the No-Fault Laws and Licensing Statutes**

19.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

20.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" benefits or "PIP Benefits") to Insureds.

21.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

22.     In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those goods and services.

23.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

24.     In the alternative, in New York a healthcare provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

25.     Pursuant to the New York no-fault insurance laws, healthcare providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

26.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.  (Emphasis added).

27.     In New York physicians are prohibited from "exercising undue influence" on patients by promoting the sale of services to exploit the patients for financial gain or ordering excessive tests and treatments not warranted by the condition of the patient. See New York Education Law § 6530(17) and (35).

28.     Furthermore, in New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

29.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

30.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See e.g., New York Education Law §6512, §6530 (11), and (19).

31.     Additionally, New York law requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. See, e.g., N.Y. Business Corporation Law § 1507. .

32.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

33.     In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019) the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

34.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits.  There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider.  The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of

healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

35.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services.  Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

36.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

37.     When a healthcare provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

38.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.        The Defendants' Fraudulent Scheme

### A.        Overview of the Scheme

39.        Beginning in 2019 and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which Apex Medical was used to bill GEICO and other New York automobile insurers hundreds of thousands of dollars for medically unnecessary, experimental, excessive and otherwise unreimbursable healthcare services (i.e., the Fraudulent Services).

40.        Apex Medical purports to be a legitimate medical professional corporation and healthcare practice but instead operated solely as part of a fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers.

41.        Apex Medical has purported to render the Fraudulent Services to Insureds in New York from October 2019 to the present, billing GEICO more than $1,883,000.00 over that period of time for such purported services.

42.        Dr. Rehman resided in, and primarily practiced in, Florida at all relevant times when Apex Medical was billing for the Fraudulent Services purportedly provided in New York.

43.        Dr. Rehman did not operate Apex Medical at any single, fixed office location, but Defendants instead used Apex Medical to operate on an itinerant basis from various New York area clinics which primarily treated No-fault patients (collectively, the "No-Fault Clinics"), where Apex Medical received steady volumes of patients by accessing the patient base already established at each No-Fault Clinic through the payment of kickbacks for patient referrals.

44.        The Fraudulent Services billed under the name of Apex Medical were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat

or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons in contravention of New York law.

**B.      Illegal Kickback and Referral Relationships**

45.      Dr. Rehman did not market the existence of Apex Medical to the general public.

46.      Dr. Rehman did not advertise for patients, never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of Apex Medical.

47.      To effectuate the scheme, Dr. Rehman colluded with the Management Defendants to operate Apex Medical on an itinerant and indiscriminate basis, moving from location to location and arbitrarily rendering or purporting to render various medically unnecessary, experimental, and excessive healthcare services – solely to exploit patients for financial gain.

48.      Dr. Rehman did not establish a practice at the various clinics from which Apex Medical operated, but rather "walked" into the No-Fault Clinics which had their own, pre-existing patient bases, pursuant to arrangements made by the Management Defendants.

49.      Dr. Rehman had no genuine doctor-patient relationship with the Insureds that visited the No-Fault Clinics, as the patients had no scheduled appointments with Apex Medical.

50.      The Insureds that were subjected to services by Apex Medical, to the extent any actual services were provided, were simply directed by the No-Fault Clinics to subject themselves to whatever treatment or service was being rendered, or purported to be rendered, by Apex Medical that day, regardless of whether there was any legitimate need for healthcare services.

51.      Initially, after Apex Medical was incorporated on July 25, 2019, the Defendants caused Apex Medical to commence operations at No-Fault Clinics located at, among other places, 3027 Avenue V, Brooklyn, New York (the "Avenue V Clinic"), 632 Utica Avenue, Brooklyn ("the

Utica Avenue Clinic"), 571 East New York Avenue, Brooklyn, New York (the "East New York Avenue Clinic"), and 984 North Broadway, Yonkers, New York (the "North Broadway Clinic").

52.     In or about October 2019 Apex Medical, under the control of the Management Defendants, began rendering and billing the same treatment for virtually every Insured who treated at the North Broadway Clinic, including Nervomatrix LINT/TPII Treatment.

53.     Thereafter, under the control of the Management Defendants, in or about December 2019, Apex Medical abruptly stopped rendering Nervomatrix LINT/TPII Treatment and in or about November 2020 began treating patients with ESWT at, among other locations, the Utica Avenue Clinic, the Avenue V Clinic, 175 Fulton Avenue, Hempstead, New York (the "175 Fulton Avenue Clinic"),  865 Cypress Avenue, Ridgewood, New York (the "Cypress Avenue Clinic"), 116-05 Myrtle Avenue, Richmond Hill, New York (the "Myrtle Avenue Clinic") and 265 Post Avenue, Westbury, New York (the "Post Avenue Clinic"). Notably, between December 2019 and November 2020 Apex Medical continued to submit fraudulent claims for trigger point injections and other pain management injections, as well as office visits at the No-Fault Clinics.

54.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the No-Fault Clinics were actually organized as "one-stop" shops for no-fault insurance fraud.

55.     In fact, several of the No-Fault Clinics from where Apex Medical operated have been the source of huge volumes of suspect No-Fault billing for years, though the names of the professional corporations operating therefrom were constantly changed in order to limit the amount of billing submitted through any single healthcare professional or entity.

56.     The No-Fault Clinics provided facilities and access to their patients to Apex Medical, as well as to a "revolving door" of medical professional corporations, chiropractic professional

corporations, acupuncture professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting the New York no-fault insurance system.

57.     GEICO received billing generated at many of these No-Fault Clinics from an ever-changing number of fraudulent healthcare providers, abruptly starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

58.     For example, GEICO has received billing from Cypress Avenue Clinic from a "revolving door" of more than 100 purportedly different healthcare providers, including Apex Medical.

59.     Similarly, GEICO has received billing from the Avenue V Clinic from a "revolving door" of approximately 69 purportedly different healthcare providers, including Apex Medical.

60.     Furthermore, GEICO has received billing from the Post Avenue Clinic from a "revolving door" of over 30 purportedly different healthcare providers, including Apex Medical.

61.     Furthermore, GEICO has received billing from the North Broadway Clinic from a "revolving door" of over 25 purportedly different healthcare providers, including Apex Medical.

62.     Insureds at the No-Fault Clinics were subjected to predetermined treatment protocols, regardless of the actual medical needs of the individual Insureds, in order to bill for the medically unnecessary services that were provided (or purported to be provided) by Apex Medical and the other medical providers at the No-Fault Clinics.

63.     Unlicensed laypersons, rather than the healthcare professionals working at the No-Fault Clinics, cultivated and controlled the patient bases at these No-Fault Clinics and designed the fraudulent treatment and billing protocols used to maximize profits without regard to actual patient care.

64.     For example, a medical doctor who worked at the East New York Avenue Clinic, and to whom Apex Medical paid rent, stated under oath that during the time he was treating patients at the East New York Avenue Clinic his signature was being affixed to prescriptions for Durable Medical Equipment without his knowledge or permission.

65.     Notably, the other healthcare providers located at the No-Fault Clinics from where Apex Medical operated, including entities to whom Apex Medical paid rent, have been the subject of insurance company investigations, affirmative fraud litigation commenced by insurers, or findings of professional misconduct.

66.     For example, David Dynof, M.D. ("Dr. Dynof") treated patients at the North Broadway Clinic and, upon information and belief, referred Insureds to Apex Medical for the Fraudulent Services. Dr. Dynof has a history of professional misconduct which resulted in discipline from the New York State Board for Professional Medical Conduct (the "New York State Board") that included a fine and thirty-six-month period of probation for – among other things – rendering medically unnecessary services.

67.     Apex Medical also purported to pay "rent" to Anni Chiropractic, P.C. ("Anni Chiro") at a No-Fault Clinic located at 632 Utica Avenue, Brooklyn, New York (the "Utica Avenue Clinic"). Anni Chiro, and its owner Inna Mayrkovich, D.C. ("Dr. Mayrkovich") were previously sued for their involvement in a no-fault fraud scheme in which Dr. Mayrkovich "sold" her chiropractic license to unlicensed laypersons who then incorporated Anni Chiro and secretly and

unlawfully owned, controlled, and derived economic benefit from it. <u>Gov't Employees Ins. Co. et al. v. East Flatbush Medical, P.C., et al.</u>, 1:20-cv-01695(MKB)(TAM) (E.D.N.Y.).

68.     Apex Medical also purported to pay "rent" to Richard Harvey, D.C. ("Dr. Harvey"). Dr. Harvey was sued for "purchasing" the licenses of an acupuncturist and physical therapist, and using those licenses to illegally own, control, and operate an improperly licensed professional limited liability company in order to submit fraudulent billing to no-fault insurers. <u>See</u>, <u>Liberty Mut. Fire Ins. Co. et al. v. Hwangbo, et al.</u>, 1:18-cv-01749 (LDH)(RLM) (E.D.N.Y.); <u>Allstate Ins. Co. et al. v. Harvey Family Chiro., Physical Therapy, & Acupuncture, PLLC et al.</u>, 1:15-cv-07149 (SJ)(CLP) (E.D.N.Y.).

69.     When Apex Medical began operating at a No-Fault Clinic, neither Dr. Rehman nor Apex Medical ever paid any money to "purchase" the prior medical practice for whom it was taking over and presumably obtaining its patient base.

70.     The Defendants instead caused Apex Medical to enter into illegal financial arrangements with the unlicensed laypersons who "brokered" or "controlled" patients who were treated, or who purported to be treated, at the No-Fault Clinics.

71.     The financial arrangements that Dr. Rehman and Apex Medical entered into included payments ostensibly to "rent" space, personnel, or equipment or fees for ostensibly legitimate business services.  However, these were "pay-to-play" arrangements that amounted to kickback payments in exchange for patient referrals to Apex Medical for the medically unnecessary Fraudulent Services.

72.     The purported "lease" agreements Apex Medical entered into in order to "rent space" at the No-Fault Clinics were shams to disguise the payment of kickbacks.

73.     In keeping with the fact that the "lease" agreements Apex Medical entered into in at the No-Fault Clinics were shams, the leases called for payments which (i) were in excess of the fair market value for leasing a small portion of space and/or shared space utilized by Apex Medical only one or two days per week and (ii) were based on the number of Insureds that could be treated at a given location or the types of services that would be rendered to the Insureds.

74.     Furthermore, the purported "lease" agreements that Apex Medical entered into at the No-Fault Clinics were never treated by the parties to the agreements as legitimate, enforceable contracts to rent space.

75.     For example, Dr. Rehman and Apex Medical never made any inquiry about the lessees' legal rights to the premises that Apex Medical purported to rent from them, never received keys to the premises to access the space on their own, and never were held bound to the lease term or other lease conditions, regardless of what was printed in the lease agreements.

76.     Furthermore, Apex Medical's purported payment of "rent" at the No-Fault Clinics was only required when Apex Medical accessed patients that could be subjected to its Fraudulent Services and, if Apex Medical stopped accessing patients, Dr. Rehman and Apex Medical were free to stop paying the purported "rent" and leave the No-Fault Clinics with little to no notice, and without any concern that they were actually bound by a legitimate, enforceable rental agreement.

77.     In fact, Dr. Rehman and Apex Medical departed a number of No-Fault Clinics by simply "letting them know" that he no longer wanted to operate at the Clinic and essentially walking out regardless of the length of the lease or any of the other terms and condition in the lease agreement.

78.     Apex Medical's sham payments of "rent" at the No-Fault Clinics were solely "pay-to-play" arrangements that resulted in Insureds being referred to Apex Medical at the No-Fault Clinics.

79.     Driven by the illegal kickbacks, when an Insured visited one of the No-Fault Clinics, he or she was automatically referred to the various healthcare providers operating from the Clinic, including Apex Medical despite the fact the Fraudulent Services never played a genuine role in the treatment or care of the Insureds.

80.     Absent these "pay-to-play" arrangements, healthcare providers operating at the No-Fault Clinics had no legitimate reason to refer Insureds to Apex Medical since Apex Medical provided no legitimate or necessary healthcare services to the Insureds.

81.     The amount of the kickbacks paid by Defendants generally was based on the volume of Insureds that were steered to Apex Medical for the medically unnecessary Fraudulent Services.

82.     Alternatively, the amount of the kickbacks paid by Apex Medical was based on the types of Fraudulent Services that Apex Medical received referrals for and rendered to Insureds at a particular No-Fault Clinic.

83.     The unlawful kickback and referral arrangements were essential to the success of Defendants' fraudulent scheme. Defendants derived significant financial benefit from the relationships because without access to the Insureds, Defendants would not have the ability to execute the fraudulent treatment and billing protocol and to bill GEICO and other insurers huge sums for the Fraudulent Services.

84.     Furthermore, the Defendants would not have had access to the No-Fault Clinics and the Insureds but for the payment of kickbacks.

85.     The Defendants at all times knew that the kickback and referral arrangements were illegal and therefore took affirmative steps to conceal the existence of the fraudulent referral scheme.

C.      **The Defendants' Fraudulent Treatment and Billing Protocols**

86.     As part of their scheme to defraud, the Defendants rendered, or purport to render, a mix of medically unnecessary, excessive, and experimental services using fraudulent treatment and billing protocols to bill GEICO and the New York automobile insurance industry egregious amounts for performance of the Fraudulent Services.

87.     Virtually all the Insureds whom Apex Medical purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, virtually none of the Insureds whom Apex Medical purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

88.     Nevertheless, Apex Medical, in accordance with the pre-determined fraudulent treatment and billing protocol in place at the No-Fault Clinics, subjected Insureds to illusory, experimental, and medically unnecessary healthcare services regardless of the severity of the Insureds' injuries (or lack thereof).

89.     The treatments were administered pursuant to a pre-determined treatment protocol designed to maximize the billing that the Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to them.

90.     As part of the scheme, Apex Medical purported to subject the Insureds to the Fraudulent Services without regard for the Insureds' individual symptoms or presentation, or the absence of any medical problems arising from any actual automobile accidents.

91.     During the times Apex Medical was providing Nervomatrix LINT/TPII Treatment, it did not perform a variety of treatments and services, rather LINT/TPII services comprised approximately 96% of the total billing submitted to GEICO by Apex Medical.

92.     Similarly, during the times Apex Medical was performing ESWT at the No-Fault Clinics, it comprised approximately 80% of the total billing submitted to GEICO by Apex Medical.

93.     Dr. Rehman permitted the fraudulent treatment and billing protocol described below to proceed under his auspices solely to maximize profits and exploit Insureds for financial gain.

**A.  The Fraudulent Charges for Nervomatrix LINT/TPII Treatment**

94.     Apex Medical purported to subject many Insureds to medically unnecessary Nervomatrix LINT/TPII Treatments using a device created by a company called Nervomatrix (the "Nervomatrix Device").

95.     The Defendants billed the Nervomatrix LINT/TPII Treatments to GEICO under CPT codes 95999 and 9919 -- which codes are used for "unlisted" special services, procedure or reports – because there is no listed CPT code for Nervomatrix LINT/TPII Treatments.

96.     The Defendants' charges to GEICO using the unlisted codes virtually always resulted in a charge of $2,455.00 per session of Nervomatrix LINT/TPII Treatment.

97.     The Defendants' charges for the Nervomatrix LINT/TPII Treatments were fraudulent in that the Nervomatrix LINT/TPII Treatments were medically useless and were provided, to the extent they were provided at all, solely in order to maximize the billing submitted to GEICO, not to treat or otherwise benefit the Insureds who purportedly were subjected to them.

98.     What is more, the Defendants' charges for the Nervomatrix LINT/TPII Treatments were fraudulent in that they misrepresented the nature of the service provided by the Nervomatrix LINT/TPII Treatment and, by extension, misrepresented the reimbursement to which Apex Medical was entitled.

99.     Additionally, the charges for the Nervomatrix LINT/TPII Treatments were fraudulent in that the Nervomatrix LINT/TPII Treatments were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks Apex Medical paid to unlicensed laypersons who controlled the patients bases at the No-Fault Clinics.

100.     Nervomatrix's Device purported to use proprietary technology that allegedly both diagnosed and treated trigger points, but there has never been any reliable, peer-reviewed data that established the effectiveness of the Nervomatrix Device or Nervomatrix LINT/TPII Treatment.  In fact, Nervomatrix itself ceased operations and dissolved.

(i)     <u>Standard of Care for the Diagnosis and Treatment of Trigger Points</u>

101.     Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

102.     In a legitimate clinical setting, trigger points are diagnosed as part of a standard physical examination based upon pain that results when pressure is applied to a specific area of a patient's body.

103.     In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

104.     Should an initial course of conservative therapies fail to remediate trigger points, trigger point injections may be warranted. Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense

muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

(ii)    <u>The Medically Useless Nervomatrix LINT/TPII Treatment</u>

105.    Nervomatrix LINT/TPII Treatment purports to be a two-step process that allegedly both diagnoses and treats trigger points. First, the Nervomatrix Device allegedly identifies the most clinically relevant active trigger points along a person's skin by measuring electrical resistance on the skin surface, which generates a two-dimensional image of skin impedance. Then a moving row of twenty-six miniature probes that touch, but do not penetrate, the skin surface provide electrical pulses to the targeted trigger points. These electrical pulses purportedly stimulate the release of endorphins to alleviate a patient's pain.

106.    In reality, Nervomatrix LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points.

107.    In keeping with the fact that Nervomatrix LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, the Nervomatrix Device has never been approved by the United States Food and Drug Administration ("FDA") to be used in the diagnosis and treatment of trigger points.

108.    There are no reliable, peer-reviewed data that establish the effectiveness of the Nervomatrix Device and Nervomatrix LINT/TPII Treatment. To the contrary, studies have found that the Nervomatrix Device does not actually improve a patient's back pain and does not result in a better outcome than a placebo treatment. Notably, the only published data that contends the Nervomatrix Device is effective in diagnosing and treating trigger points was published in 2011 by Dr. Miguel Gorenberg, the founder of Nervomatrix – the company that developed and manufactured the Nervomatrix Device.

21

109.    In further keeping with the fact that Nervomatrix LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, Nervomatrix ceased operations in 2018 and was dissolved on February 17, 2019. In addition, the company's website, www.soleve.com, is no longer operational.

110.    In keeping with the fact that that Nervomatrix LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for Nervomatrix LINT/TPII Treatment.

111.    In keeping with the fact that the Nervomatrix LINT/TPII Treatment was performed pursuant to predetermined treatment protocols designed to maximize billing without regard for patient care, at times Apex Medical did not conduct medical examinations to assess the Insureds' physical condition prior to administering Nervomatrix LINT/TPII Treatment instead performing the Nervomatrix LINT/TPII Treatment pursuant to purported referrals from other healthcare providers (the "Referring Providers").

112.    Apex Medical, however, virtually never identified the Referring Provider who referred the Insured for Nervomatrix LINT/TPII Treatment.

113.    Moreover, Apex Medical's medical records were misleading as they submitted letters of medical necessity to GEICO which suggested that the No-Fault Fee Schedule had established some standard of treatment with respect to LINT/TPII when in fact it had not.

114.    In keeping with the fact that the Nervomatrix LINT/TPII Treatment is medically useless for both the diagnosis and treatment of trigger points and was administered pursuant to a predetermined treatment and billing protocol, the putative "results" of the Nervomatrix LINT/TPII

Treatments purportedly performed by Apex Medical: (i) were not incorporated into any Insureds'

treatment plans; (ii) played no legitimate role in the overall treatment or care of the Insureds; and

(iii) had minimal, if any, impact on the Insureds' levels of back pain. For example,

(i)     An Insured named JK was allegedly involved in a motor vehicle accident on July 5, 2019. Thereafter, he sought treatment at the North Broadway Clinic. On October 18, 2019, he underwent a medical examination at DRD Medical, P.C. ("DRD Medical") with Dr. Dynof at which he reported lower back pain at a 7/10 pain level and middle back pain at a 4/10 pain level. Thereafter, Apex Medical purported to provide Nervomatrix LINT/TPII Treatments to JK's lumbar and thoracic spine on October 28, 2019, November 6, 2019, November 13, 2019, and November 20, 2019. At a follow up examination with DRD Medical on December 20, 2019, JK reported lower back pain at 8/10 and middle back pain at 5/10.

(ii)    An Insured named JRH was allegedly involved in a motor vehicle accident on May 15, 2019. Thereafter, she sought treatment the North Broadway Clinic. On November 1, 2019, she underwent a medical examination at DRD Medical with Dr. Dynof at which she reported lower back pain at a 9/10 pain level and middle back pain at a 5/10 pain level. Thereafter, Apex Medical purported to provide Nervomatrix LINT/TPII Treatments to JRH's lumbar and thoracic region on November 11, 2019, November 22, 2019, December 17, 2019, and December 26, 2019. At a follow up examination with DRD Medical on January 20, 2020, JRH reported lower back pain at 9/10 and middle back pain at 6/10.

(iii)   An Insured named MC was allegedly involved in a motor vehicle accident on October 23, 2019. Thereafter, she sought treatment at the North Broadway Clinic. On October 25, 2019, she underwent a medical examination at DRD Medical with Dr. Dynof at which she reported lower back pain at a 6/10 pain level and middle back pain at a 7/10 pain level. Thereafter, Apex Medical purported to provide Nervomatrix LINT/TPII Treatments to MC's thoracic and lumbar region on October 29, 2019, November 6, 2019, November 13, 2019, and November 20, 2019. At a follow up examination with DRD Medical on November 25, 2020, MC reported lower back pain at 7/10 and middle back pain at 7/10.

(iv)    An Insured named TF was allegedly involved in a motor vehicle accident on June 22, 2019. Thereafter, she sought treatment at the North Broadway Clinic. On September 25, 2019, she underwent a medical examination at DRD Medical with Dr. Dynof at which she reported lower back pain at a 6/10 pain level and middle back pain at a 5/10 pain level. Thereafter, Apex Medical purported to provide Nervomatrix LINT/TPII Treatments to TF's thoracic and lumbar region on October 9, 2019, October 16, 2019, October 23, 2019, and October 30, 2019.

At a follow up examination with DRD Medical on November 22, 2019, TF reported lower back pain at 8/10 and middle back pain at 6/10.

(v)     An Insured named DC was allegedly involved in a motor vehicle accident on June 4, 2019. Thereafter, she sought treatment at the North Broadway Clinic. On October 30, 2019, she underwent a medical examination at DRD Medical with Dr. Dynof at which he reported her middle back pain was at a 4/10 pain level and her upper back pain was a 4/10 level. Thereafter, Apex Medical purported to provide Nervomatrix LINT/TPII Treatments to DC's thoracic region on November 11, 2019, November 20, 2019, November 26, 2019, and December 10, 2019. At a follow up examination with DRD Medical on January 3, 2020, DC reported middle back pain at a 5/10 level and upper back pain at a 4/10 level.

(vi)    An Insured named AD was allegedly involved in a motor vehicle accident on July 8, 2019. Thereafter, he sought treatment at the North Broadway Clinic. On October 11, 2019, he underwent a medical examination at DRD Medical with Dr. Dynof at which he reported lower back pain at a 9/10 pain level and middle back pain at an 8/10 pain level. Thereafter, Apex Medical purported to provide Nervomatrix LINT/TPII Treatments to AD's lumbar and thoracic region on October 30, 2019, November 6, 2019, November 15, 2019, and November 22, 2019. At a follow up examination with DRD Medical on January 10, 2020, AD reported lower back pain at 8/10 and middle back pain at 7/10.

(vii)   An Insured named SP was allegedly involved in a motor vehicle accident on May 31, 2019. Thereafter, she sought treatment at the North Broadway Clinic. On October 7, 2019, she underwent a medical examination at DRD Medical with Dr. Dynof at which she reported lower back pain at a 10/10 pain level and middle back pain at a 9/10 pain level. Thereafter, Apex Medical purported to provide Nervomatrix LINT/TPII Treatments to SP's lumbar and thoracic region on October 7, 2019, October 18, 2019, October 23, 2019, and November 8, 2019. At a follow up examination with DRD Medical on December 6, 2019, SP reported lower back pain at 8/10 and middle back pain at 7/10.

(viii)  An Insured named OS was allegedly involved in a motor vehicle accident on March 1, 2019. Thereafter, she sought treatment at the North Broadway Clinic. On September 18, 2019, she underwent a medical examination at DRD Medical with Dr. Dynof at which she reported lower back pain at a 3/10 pain level and middle back pain at a 10/10 pain level. Thereafter, Apex Medical purported to provide Nervomatrix LINT/TPII Treatments to OS's lumbar and thoracic region on October 15, 2019, October 21, 2019, October 29, 2019, and November 5, 2019. At a follow up examination with DRD Medical on February 10, 2020, OS reported lower back pain at 7/10 and middle back pain at 7/10.

(ix)    An Insured named GL was allegedly involved in a motor vehicle accident on July 1, 2019. Thereafter, he sought treatment at the North Broadway Clinic. On

October 16, 2019, he underwent a medical examination at DRD Medical with Dr. Dynof at which she reported lower back and middle back pain both at a 9/10 pain level. Thereafter, Apex Medical purported to provide Nervomatrix LINT/TPII Treatments to GL's thoracic and lumbar regions on October 24, 219, November 7, 2019, November 15, 2019, and November 22, 2019. At a follow up examination with DRD Medical on December 18, 2019, GL lower back pain at 8/10 and middle back pain at 7/10.

115.     These are only representative examples. In virtually all the claims for Nervomatrix LINT/TPII Treatment identified in Exhibit "1" the putative "results" of the Nervomatrix LINT/TPII Treatments purportedly performed by Apex Medical: (i) were not incorporated into any Insureds' treatment plan; (ii) played no legitimate role in the overall treatment or care of the Insureds; and (iii) had minimal, if any, impact on the Insureds' levels of back pain.

116.     To create the false appearance that the Nervomatrix LINT/TPII Treatments provided pain relief for the Insureds who were subjected to them by Apex Medical, at the conclusion of each Nervomatrix LINT/TPII Treatment session Apex Medical reported "[p]atient reported percent of relief in pain since baseline evaluation."

117.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in an automobile accident.

118.     It is extremely improbable – to the point of impossibility – that virtually all Insureds who received Nervomatrix LINT/TPII Treatments from the Defendants would experience a reduction in pain virtually every time they underwent Nervomatrix LINT/TPII Treatments. In fact, many Insureds actually reported an increase in pain during follow examinations, as demonstrated in some of the examples above.

119.     In further keeping with the fact that the Nervomatrix LINT/TPII Treatment was medically unnecessary and performed pursuant to a predetermined treatment protocol, Apex

Medical performed Nervomatrix LINT/TPII Treatment on Insureds who also received trigger point injections under guidance, both of which purport to treat the same condition. For example,

(i)      Insured RR was allegedly involved in a motor vehicle accident on June 23, 2019. On October 9, 2019 and October 16, 2019, RR received trigger point injections with ultrasound guidance *and* Nervomatrix LINT/TPII Treatment administered by Apex Medical. RR received additional Nervomatrix LINT/TPII Treatment from Apex Medical on October 23, 2019, and November 7, 2019.

(ii)     Insured MM was allegedly involved in a motor vehicle accident on July 5, 2019. On October 28, 2019, and November 6, 2019 MM received Nervomatrix LINT/TPII Treatment from Apex Medical. On November 13, 2020, MM received a trigger point injection *and* Nervomatrix LINT/TPII Treatment administered by Apex Medical. MM received additional Nervomatrix LINT/TPII Treatment from Apex Medical on November 20, 2019.

(iii)    Insured JH was allegedly involved in a motor vehicle accident on July 24, 2019. On October 10, 2019, JH received a trigger point injection with ultrasound guidance *and* Nervomatrix LINT/TPII Treatment administered by Apex Medical. JH received additional Nervomatrix LINT/TPII Treatment from Apex Medical on November 8, 2019.

(iv)     Insured MN was allegedly involved in a motor vehicle accident on August 5, 2019. On October 2, 2019, MN received Nervomatrix LINT/TPII Treatment from Apex Medical. On October 10, 2019, MN received a trigger point injection with ultrasound guidance *and* Nervomatrix LINT/TPII Treatment from Apex Medical. MN received additional Nervomatrix LINT/TPII Treatment from Apex Medical on October 17, 2019, and October 24, 2019.

(v)      Insured BN was allegedly involved in a motor vehicle accident on October 2, 2019. On October 9, 2019, BN received trigger point injections with ultrasound guidance *and* Nervomatrix LINT/TPII Treatment administered by Apex Medical. BN received additional Nervomatrix LINT/TPII Treatment from Apex Medical October 15, 2019, October 22, 2019, and October 29, 2019.

(vi)     Insured JK was allegedly involved in a motor vehicle accident on July 5, 2019. On October 28, 2019, JK received Nervomatrix LINT/TPII Treatment from Apex Medical. On November 6, 2019, JK received a trigger point injection with ultrasound guidance *and* Nervomatrix LINT/TPII Treatment administered by Apex Medical. On November 13, 2019, and November 20, 2019, JK received additional Nervomatrix LINT/TPII Treatment from Apex Medical.

(vii)    Insured TF was allegedly involved in a motor vehicle accident on June 22, 2019. On October 9, 2019, TF received trigger point injections with ultrasound guidance *and* Nervomatrix LINT/TPII Treatment administered by Apex

Medical. TF received additional Nervomatrix LINT/TPII Treatment from Apex Medical on October 16, 2019, October 23, 2019, and October 30, 2019.

    (viii)       Defendants' Billing for LINT/TPII

120.    Even if LINT/TPII had any medical utility – which it does not -- at best the LINT/TPII machine treated insureds with electrical stimulation and therefore should be billed to insurance companies at a significantly reduced rate, rather than the $2,455.00 per session charge billed by Defendants.

121.    Apex Medical billed the Nervomatrix LINT/TPII services using CPT code 99199, which is described by the medical fee schedule as an "unlisted special service, procedure or report, and CPT code 95999, which is described by the medical fee schedule as "other neurology and neuromuscular procedures" and are assigned relative values "by report."

122.    Fees for procedures that are assigned "by report" must be justified by the nature, extent, and need for the procedure or service, the time, skill, and equipment necessary. Furthermore, the reimbursement rate established by the provider should be consistent in relativity with other relative value units in the medical fee schedule.

123.    Inasmuch as LINT Treatment amounts to unattended electrical stimulation, this type of electrical stimulation, to the extent it is reimbursable, should be billed under CPT codes 97014 and 97032 for a total value of $41.40 per thirty-minute treatment session.

124.    Furthermore, TPII purports to look for trigger points. Practitioners can manually look for trigger points or use ultrasound guidance to identify trigger points for the purpose of administering trigger point injections. When a practitioner chooses to use ultrasound guidance to identify the location of trigger points it is billed under CPT code 76942. Because TPII purports to provide a functionally equivalent service to ultrasound guidance, to the extent such ultrasound guidance is reimbursable the appropriate fee reimbursement would be $262.91.

125. Therefore, even if there was any basis for Apex Medical to bill for LINT/TPII treatments -- in the absence of peer-reviewed data that establish the effectiveness of the treatments using a device from a company that ceased operations and dissolved -- the Defendants' charges misrepresented the nature of the services provided and inflated the billing by approximately eight times the amount that was appropriate, to the extent reimbursable in the first place.

126. Finally, in addition to all of the above, in the claims for Nervomatrix LINT/TPII Treatments identified in Exhibit "1" the charges were fraudulent in that they misrepresented Apex Medical's eligibility to collect No-Fault Benefits in the first instance because – as a result of the illegal kickback, improper financial arrangements and referral scheme described herein – they were not in compliance with relevant laws and regulations governing healthcare practice in New York.

**B.  The Fraudulent Charges for ESWT**

127. Apex Medical purported to subject many Insureds to medically unnecessary ESWT "treatments."

128. Apex Medical billed the ESWT to GEICO under CPT Code 0101T, which is listed in the Fee Schedule as a "temporary code" identifying emerging technology. Temporary codes may become permanent codes or may be deleted during updates of the code set.

129. The Defendants' billing for ESWT through Apex Medical under CPT code 0101T generally resulted in charges resulting in a charge of $700.39 for each single treatment.

130. Apex Medical typically billed GEICO for multiple treatment sessions of ESWT per Insured, often resulting in charges as high as $15,408.58 per Insured, with charges occasionally exceeding that.

131.    The Defendants' charges for the ESWT were fraudulent in that the ESWT was medically useless and was provided, to the extent it was provided at all, solely in order to maximize the billing submitted to GEICO, not to treat or otherwise benefit the Insureds who purportedly were subjected to them.

132.    Additionally, the charges for the ESWT were fraudulent in that the ESWT was medically unnecessary and was performed – to the extent that it was performed at all – pursuant to the kickbacks Apex Medical paid to unlicensed laypersons who controlled the patient bases at the No-Fault Clinics.

133.    Pursuant to the Fee Schedule, CPT code 0101T applies to "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy".

134.    ESWT is a nonsurgical treatment that involves the delivery of high energy shock waves to musculoskeletal areas of the body with the purported goal of reducing pain and promoting the healing of affected soft tissue.

135.    During ESWT, the practitioner moves an applicator over a gel-covered treatment area. As the applicator is moved over the treatment area, pressure waves that purportedly stimulate the metabolism, enhance blood circulation, and accelerate the healing process are released into the treatment area.

136.    Typically, Apex Medical purported to perform ESWT on Insureds experiencing musculoskeletal pain, including cervical, thoracic, or lumbar spine pain, though at times Apex Medical administered ESWT to Insureds' shoulders, ankles, or other extremities.

137.    In a legitimate clinical setting, treatment for back pain and other musculoskeletal conditions should begin with conservative therapies such as bed rest, active exercises, physical

therapy, heating or cooling modalities, massage, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

138.     If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication. These clinical approaches are well-established.

139.     By contrast, the use of ESWT for the treatment of back pain and other musculoskeletal conditions is experimental and investigational.

140.     In keeping with the fact that ESWT for the treatment of back pain and other musculoskeletal conditions is not a legitimate treatment option, ESWT has not been approved by the FDA for the treatment of back pain or other musculoskeletal conditions.

141.     Indeed, the only FDA approved uses for ESWT are the treatment of plantar fasciitis, (i.e., heel pain) and lateral epicondylitis (i.e., tennis elbow).

142.     What is more, there are no legitimate peer-reviewed data that establish the effectiveness of ESWT for the treatment of back pain or other musculoskeletal conditions.

143.     Additionally, the ESWT machine used by Apex Medical is FDA approved only for the treatment of chronic plantar fasciitis in patients who have previously failed conservative therapy.

144.     Furthermore, the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered

145.     In keeping with the fact that ESWT for the treatment of musculoskeletal conditions is not a legitimate treatment option: (i)  Medicare does not consider ESWT reasonable or necessary for the treatment of musculoskeletal conditions and therefore does not cover it; (ii) Aetna insurance company considers ESWT experimental and investigational for the treatment of low back pain, lower limb conditions, and other musculoskeletal indications and, as such, does not cover it; (iii) UnitedHealth Group Incorporated care does not cover ESWT for the treatment of musculoskeletal or soft tissue indications due to insufficient evidence of its efficacy in those applications; (iv) the Blue Cross Blue Shield Association does not cover ESWT for the treatment of musculoskeletal conditions because it is considered investigational; and (v) Cigna considers ESWT experimental, investigational, or unproven for any indication, including the treatment of musculoskeletal conditions and soft tissue wounds, and therefore does not cover it.

146.     Therefore, in the claims for ESWT identified in Exhibit "1", Apex Medical falsely represented that the ESWT that they purported to provide to Insureds was medically necessary, when in fact it was not.

147.     As with the other Fraudulent Services, the ESWT was administered pursuant to a predetermined fraudulent treatment and billing protocol, designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

148.     At times Apex Medical did not conduct medical examinations to assess the Insureds' physical condition prior to administering ESWT. Instead, Apex Medical purported to perform the ESWT pursuant to referrals from the Referring Providers.

149.     To obscure the fact that Apex Medical administered ESWT pursuant to a predetermined treatment protocol, and illegal, collusive arrangements with Referring Providers,

Apex Medical virtually never identified the Referring Providers in their billing submissions to GEICO.

150.    In keeping with the fact that the ESWT is medically useless for the treatment of back pain or other musculoskeletal conditions, the putative "results" of the ESWT purportedly performed by Apex Medical: (i) were not incorporated into any Insureds' treatment plans; (ii) played no legitimate role in the overall treatment or care of the Insureds; and (iii) had minimal, if any, impact on the Insureds' levels of back or extremity pain.

151.    Rather, virtually all medical records generated as a result of the ESWT contained preprinted boilerplate language indicating the Insureds experienced some improvement in pain at the conclusion of each follow-up ESWT session.

152.    However, to the extent Apex Medical completed a subjective pain scale with the Insureds who underwent ESWT, the Insureds often reported minimal reduction in pain, and, at times, reported no reduction in pain whatsoever. For example,

(i)     An Insured named AS was allegedly involved in a motor vehicle accident on October 4, 2020. Thereafter he sought treatment with Apex Medical at the Utica Avenue Clinic. On October 26, 2020, AS underwent a follow up examination with Apex Medical at which ESWT was prescribed. Thereafter, Apex Medical purported to administer ESWT to AS' right and left upper back on November 12, 2020, November 19, 2020, and December 31, 2020. On November 12, 2020 and November 19, 2020, AS reported his right and left upper back pain was a 6/10, and on December 31, 2020 he reported his right and left upper back pain was a 7/10. Similarly, Apex Medical purported to administer ESWT to AS' right and left lower back on December 7, 2020, December 14, 2020, and December 28, 2020. On December 7, 2020 and December 14, 2020, AS reported his right and left lower back pain was a 7/10, and on December 28, 2020 AS reported his lower back pain was aa 7/10.

(ii)    An Insured named JCG was allegedly involved in a motor vehicle accident on January 2, 2021. He sought treatment with Apex Medical at the Utica Avenue Clinic. Thereafter Apex Medical purported to administer ESWT to this Insured's right and left lower back on January 14, 2021 and January 18, 2021. At the conclusion of each treatment JCG reported his back pain remained an 8/10.

32

(iii) An Insured named FT was allegedly involved in a motor vehicle accident on November 30, 2020. He sought treatment with Apex Medical at the Avenue V Clinic. Thereafter Apex Medical purported to administer ESWT to this Insured's right and left cervical spine on December 16, 2021 and January 12, 2021. On December 16, 2021, FT reported his cervical spine pain was a 5/10 and on January 12, 2021, FT reported his cervical spine pain was a 7/10.

(iv) An Insured named FC was allegedly involved in a motor vehicle accident on November 30, 2020. He sought treatment with Apex Medical at the 175 Fulton Avenue Clinic. Thereafter Apex Medical purported to administer ESWT to his Insured's right and left lower back on January 26, 2021, January 28, 2021, February 9, 2021, and February 11, 2021. However, on January 26, 2021, February 9, 2021, and February 11, 2021, FT reported his right and left lower back pain was an 8/10. Similarly, Apex Medical purported to administer ESWT to FC's right and left thoracic spine on March 2, 2021, March 4, 2021, March 11, 2021, and March 16, 2021. However, on March 2, 2021 and March 4, 2021, FC reported his right and left thoracic spine pain was a 7/10, and on March 11, 2021 and March 16, 2021, FC reported his right and left thoracic spine pain was a 6/10.

(v) An Insured named KW was allegedly involved in a motor vehicle accident on November 28, 2020. She sought treatment with Apex Medical at the Avenue V Clinic. Thereafter Apex Medical purported to administer ESWT to KW's right and left cervical spine on December 2, 2020 and January 22, 2021. On both December 2, 2020 and January 22, 2021, KW reported her right and left cervical spine pain was a 9/10. Similarly, Apex Medical purported to administer ESWT to KW's right and left thoracic spine on December 10, 2020, January 19, 2021, and January 26, 2021. On December 10, 2020, KW reported her thoracic spine pain was a 6/10, on January 19, 2021, KW reported her thoracic spine pain was a 7/10, and on January 26, 2021, KW reported her thoracic spine pain was a 9/10. Finally, Apex Medical purported to administer ESWT to KW's right and left lower back on December 5, 2020, December 9, 2020, December 14, 2020, and December 30, 2020. On December 5, 2020 KW reported her right and left lower back pain was a 7/10. On December 9, 2020, KW reported her right and left lower back pain was a 6/10. On December 14, 2020 KM reported her right and left lower back pain was a 7/10 and on December 30, 2020, KW reported her right and left lower back pain was a 6/10.

(vi) An Insured named YF was allegedly involved in a motor vehicle accident on August 13, 2020. She sought treatment with Apex Medical at the Utica Avenue Clinic. Thereafter Apex Medical purported to administer ESWT to YF's left shoulder on November 5, 2020, November 12, 2020, and December 31, 2020. On November 5, 2020 and November 12, 2020, YF reported her left shoulder pain was a 6/10. On December 31, 2020, YF reported her left shoulder pain was a 7/10.

153.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in an automobile accident.

154.    It is extremely improbable – to the point of impossibility – that virtually all Insureds who received ESWT from Apex Medical would experience a reduction in pain virtually every time they underwent ESWT, as represented by Apex Medical's records.

155.    In further keeping with the fact that the ESWT provided by Apex Medical was fraudulent, and rendered pursuant to predetermined protocols, in many cases Apex Medical purported to provide ESWT treatments to Insureds very early in the treatment cycle, sometimes within a few days or weeks of the Insured's accident, without giving the patients the opportunity to sufficiently respond to conservative physical therapy.

156.    Finally, in addition to all of the above, in the claims for ESWT identified in Exhibit "1" the charges were fraudulent in that they misrepresented Apex Medical's eligibility to collect No-Fault Benefits in the first instance because – as a result of the illegal kickback, improper financial arrangements and referral scheme described herein – they were not in compliance with relevant laws and regulations governing healthcare practice in New York.

**C. The Fraudulent Charges for Medically Unnecessary Trigger Point Injections and Pain Management Injections**

157.    At the direction of the Management Defendants, Apex Medical purported to subject many Insureds to a series of medically unnecessary pain management injections, including, but not limited to trigger point injections with ultrasound guidance.

158.    The trigger point injections were billed to GEICO through Apex Medical typically using CPT code 20553, representing trigger point injections in 3 or more muscles, or CPT code 20552, representing trigger point injections in two or more muscles.

34

159.     Like the charges for the other Fraudulent Services, the charges for the trigger point injections and pain management injections were fraudulent in that the injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to phony, boilerplate "diagnoses" and "treatment plans" that Apex Medical provided during fraudulent initial and follow-up examinations.

160.     In the claims for trigger point injections and pain management injections identified in Exhibit "1" the charges for the injections were fraudulent in that they misrepresented Apex Medical's eligibility to collect No-Fault Benefits in the first instance because – as a result of the illegal kickback, improper financial arrangements and referral scheme described herein – they were not in compliance with relevant laws and regulations governing healthcare practice in New York.

(i)      Standards for the Legitimate Use of Trigger Point Injections

161.     Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

162.     Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

163.     In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

164.    As a result, in a legitimate clinical setting, trigger point injections should not be administered until a patient has pain symptoms that have persisted for more than three months, and has failed or been intolerant of conservative therapies for at least one month.

165.    Furthermore, in a legitimate clinical setting, trigger point injections should not be administered more than once every two months, or more than six times in any given year.

166.    This is because: (i) properly administered trigger point injections should provide pain relief lasting for at least two months; (ii) a proper interval between trigger point injections is necessary to determine whether or not the initial trigger point injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

(ii)    The Medically Unnecessary Trigger Point Injections

167.    In the claims for trigger point injections identified in Exhibit "1" Apex Medical routinely purported to administer trigger point injections to the Insureds before the Insureds had pain symptoms that persisted for more than three months, and/or before the Insureds had failed or been intolerant of more conservative therapies for at least one month.

168.    For example, Apex Medical routinely purported to provide trigger point injections within less than three months – and in some cases, within a few days or weeks – of the Insureds' automobile accidents, before the Insureds could possibly have failed any legitimate course of conservative treatment.

169.    For example,

(i)    Insured BaC was allegedly involved in a motor vehicle accident on November 8, 2020. One day later, on November 9, 2020, BaC received trigger point injections administered by Apex Medical.

(ii)    Insured BrC was allegedly involved in the same motor vehicle accident as BaC, supra, on November 8, 2020. Like BaC, one day later, on November 9, 2020, BrC received trigger point injections administered by Apex Medical.

(iii)   Insured DZ was allegedly involved in a motor vehicle accident on July 5, 2020. Three days later, on July 8, 2020, DZ received trigger point injections administered by Apex Medical.  DZ received additional injections a week later on July 15, 2020, and again on July 27, 2020.

(iv)    Insured UTM was allegedly involved in a motor vehicle accident on August 15, 2020. Four days later, on August 19, 2020, UTM received trigger point injections administered by Apex Medical.

(v)     Insured JT was allegedly involved in a motor vehicle accident on May 6, 2020. Five days later, on May 11, 2020, JT received trigger point injections administered by Apex Medical. JT received additional injections on September 17, 2020.

(vi)    Insured GA was allegedly involved in a motor vehicle accident on October 8, 2020. Four days later, on October 12, 2020, GA received trigger point injections administered by Apex Medical. GA received additional injections a few weeks later on November 10, 2020.

(vii)   Insured AM was allegedly involved in a motor vehicle accident on October 8, 2020. Five days later, on October 13, 2020, AM received trigger point injections administered by Apex Medical.

170.    These are only representative examples. Apex Medical routinely purported to provide and bill for medically unnecessary trigger point injections to Insureds long before the Insureds could possibly have tried and failed any course of legitimate, conservative treatment.

171.    Furthermore, in the claims for trigger point injections identified in Exhibit "1" at times Apex Medical purported to administer multiple rounds of trigger point injections to the Insureds within a span of weeks, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

172.    Even when performed correctly, the injections Apex Medical purported to provide can cause significant adverse events including infection, nerve injury, hypotension, anesthetic toxicity, or even death.

173.    To the extent Apex Medical actually administered injections to Insureds with the frequency set forth in their billing, Apex Medical increased these risks exponentially.

174.    Indeed, as part of a fraudulent billing and treatment protocol designed and employed by the Defendants solely to maximize the potential charges that they could submit to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the injections, Apex Medical subjected patients to trigger point injections before the Insureds had failed any course of legitimate, more conservative treatment

175.    To further increase the fraudulent billing that they submitted for each round of medically unnecessary trigger point injections, Apex Medical routinely submitted a separate charge under CPT code 76942 for "ultrasound guidance" of the trigger point injections, charging $262.91 per "unit" of guidance.

176.    The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as, like the underlying trigger point injection itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to pre-determined fraudulent protocols and illegal kickback and financial arrangements, designed to maximize Apex Medical's billing rather than to treat the Insureds who supposedly were subjected to it.

177.    Notably, ultrasound guidance is not required to properly administer a trigger point injection.  Moreover, (i) Apex Medical virtually never appropriately documented the use, need, or placement of the ultrasound guidance, (ii) nor were there any images included in Apex Medical's records, or any notations that images were placed into the Insureds' charts, calling into question whether ultrasound guidance was even performed in the first instance.

178.    In addition to the ultrasound guidance, to further increase the fraudulent billing that they submitted for each round of medically unnecessary trigger point injections, Apex Medical routinely submitted a separate charge of $57.26 – under CPT code 20610 – for "arthrocentesis aspiration" of a major joint.

179.    The charges under CPT code 20610 were fraudulent because, like the underlying trigger point injection and ultrasonic guidance, the arthrocentesis was not medically necessary and was performed – to the extent that it was performed at all – pursuant to pre-determined fraudulent protocols and illegal kickback and financial arrangements, designed to maximize Apex Medical's billing rather than to treat the Insureds who supposedly were subjected to it.

180.    Like Apex Medical's charges for the other Fraudulent Services, the charges for the trigger point injections and additional billed services on the same day were fraudulent in that they were performed – to the extent they were performed at all – pursuant to predetermined fraudulent treatment and billing protocols and illegal kickback and financial arrangements and referral schemes, designed solely to maximize profits without any regard for genuine patient care.

   **D. The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

181.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted thousands of charges (i.e., bills, NF-3 forms, HCFA-1500 forms) and/or treatment reports through Apex Medical to GEICO seeking payment for the Fraudulent Services for which Defendants were not entitled to receive.

182.    The bills and treatment reports submitted to GEICO by and on behalf of Apex Medical were false and misleading in the following material respects:

- the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent

protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

- Dr. Rehman, Apex Medical and the other Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, Apex Medical was ineligible to bill for or to collect No-Fault Benefits; and

- the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

**E.** **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

183.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

184.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systemically concealed their fraud.

185.    Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that Apex Medical were fraudulently incorporated and/or unlawfully owned and controlled by unlicensed laypersons.

186.    Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent predetermined protocols designed to maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to them.

187.    Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the Fraudulent Services were performed pursuant to illegal kickback and referral arrangements.

188.    Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that Apex Medical engaged in illegal fee splitting with non-physicians in violation of New York law.

189.    In fact, among other things, Defendants rendered, or purported to render, the Fraudulent Services at different No-fault clinics indiscriminately and at different times in order to conceal the volume of billing for any particular service and the volume of billing from any particular clinic.

190.    Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that Defendants unlawfully exchanged kickbacks for patient referrals.

191.    Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

192.    Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

193.    GEICO is under statutory and contractual obligations to process claims promptly and fairly within 30 days.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did cause GEICO to rely upon them.

194.    As a result, GEICO incurred damages of more than $239,000.00 based upon the fraudulent charges.

195.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint

**AS AND FOR A FIRST CAUSE OF ACTION**
**Against All Defendants**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

196.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

197.     There is an actual case and controversy between GEICO and the Defendants regarding more than $1,543,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to GEICO through Apex Medical.

198.     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Apex Medical because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

199.     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Apex Medical because Dr. Rehman, Apex Medical and the other Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, Apex Medical was ineligible to bill for or to collect No-Fault Benefits.

200.     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Apex Medical because the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

201.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment

for any pending bills submitted to GEICO under the names of Apex Medical.

**SECOND CAUSE OF ACTION**
**Against Dr. Rehman and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

202.     GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

203.     Apex Medical, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C.

§ 1961(4), that engages in activities which affect interstate commerce.

204.     Dr. Rehman and the Management Defendants knowingly have conducted and/or

participated, directly or indirectly, in the conduct of Apex Medical's affairs through a pattern of

racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C.

§ 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds

of fraudulent charges on a continuous basis for more than two years seeking payments that Apex

Medical was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services

were not medically necessary and were provided – to the extent that they were provided at all –

pursuant to pre-determined fraudulent protocols designed solely to financially enrich the

Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected

to them; (iii) Dr. Rehman, Apex Medical and the other Defendants engaged in illegal fee-splitting,

kickback, and referral arrangements and, therefore, Apex Medical was ineligible to bill for or to

collect No-Fault Benefits; and (iii) the billing codes used for the Fraudulent Services by

Defendants misrepresented and exaggerated the level and type of services that purportedly were

provided in order to inflate the charges submitted to GEICO.

205.    Apex Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Rehman and the Management Defendants operated Apex Medical, inasmuch as Apex Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Apex Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Apex Medical to the present day. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

206.    Further, Apex Medical is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it provides no medically necessary or legitimate services and its operation is only possible through its engagement in illegal fee-splitting, kickback, and referral arrangements. Apex Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Apex Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

207.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $239,000.00 pursuant to the fraudulent bills submitted by the Defendants through Apex Medical.

208.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
#### Against Dr. Rehman and the Management Defendants
#### (Violation of RICO, 18 U.S.C. § 1962(d))

209.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

210.     Apex Medical, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

211.     Dr. Rehman and the Management Defendants are employed by and/or associated with the Apex Medical enterprise.

212.     Dr. Rehman and the Management Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Apex Medical enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Apex Medical was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iii) Dr. Rehman, Apex Medical and the other Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, Apex Medical was ineligible to bill for or to collect No-Fault Benefits; and (iii) the billing codes used for the Fraudulent Services by

Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

213. Dr. Rehman and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

214. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $239,000.00 pursuant to the fraudulent bills submitted by the Defendants through Apex Medical.

215. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Apex Medical, Dr. Rehman, and the Management Defendants
### (Common Law Fraud)

216. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

217. Apex Medical, Dr. Rehman, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

218.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to predetermined, fraudulent protocols designed solely to enrich the Defendants; (iii) in every claim, the representation that Apex Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Rehman, Apex Medical and the other Defendants engaged in illegal fee-splitting, kickback, and referral arrangements: and (iii) in every claim, the representation that  the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the Fraudulent Services by Defendants misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

219.   Apex Medical, Dr. Rehman, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Apex Medical that were not compensable under the No-Fault Laws.

220.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $239,000.00 pursuant to the fraudulent bills submitted by the Defendants through Apex Medical.

221.   Apex Medical, Dr. Rehman, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

222.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Apex Medical, Dr. Rehman and the Management Defendants**
**(Unjust Enrichment)**

223.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

224.     As set forth above, Apex Medical, Dr. Rehman and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

225.     When GEICO paid the bills and charges submitted by or on behalf of Apex Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

226.     Apex Medical, Dr. Rehman, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

227.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

228.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $239,000.00.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against the Management Defendants**
**(Aiding and Abetting Fraud)**

229.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

230.    The Management Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Dr. Rehman and Apex Medical.

231.    The acts of the Management Defendants in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of Apex Medical and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Apex Medical, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

232.    The conduct of the Management Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the Management Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for the Owner Defendants or Apex Medical to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

233.    The Management Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to the Owner Defendants and Apex Medical for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

234.    The conduct of the Management Defendants caused GEICO to pay more than $239,000.00 pursuant to the fraudulent bills submitted through Apex Medical.

235.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

236.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

237. Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Dr. Rehman and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $239,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Dr. Rehman and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $239,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Apex Medical, Dr. Rehman, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $239,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Apex Medical, Dr. Rehman, and the Management Defendants, more than $239,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper.

F.      On the Sixth Cause of Action against the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $239,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: October 25, 2021

RIVKIN RADLER LLP

By:   /s/ *Michael A. Sirignano*
Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Joanna B. Rosenblatt, Esq.
926 RXR Plaza
Uniondale, New York 11556
 (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*